1

2

3

4

5

6

7

8                              IN THE UNITED STATES DISTRICT COURT

9                            FOR THE EASTERN DISTRICT OF CALIFORNIA

10   DWAYNE L. BURGESS,

11              Plaintiff,                    No. CIV S-03-0643 GEB GGH P

12        vs.

13   CHERYL K. PLILER, et al.,

14              Defendants.                   FINDINGS AND RECOMMENDATIONS

15   _____/

16   Introduction

17              Plaintiff, a state prisoner proceeding pro se, seeks relief pursuant to 42 U.S.C.

18   § 1983.  Pending before the court is the re-noticed motion for summary judgment, filed on March

19   7, 2006,[1] brought by defendants Chisum, Bledsoe, Pugh, Johnson, King and Rogers.[2]   Plaintiff

20   filed opposition to the originally noticed motion, on August 8, 2005, to which defendants filed a

21   reply on August 16, 2005.  Plaintiff filed a supplemental opposition, on March 23, 2006, to the

22   re-noticed motion.

23   _____

24        [1]  The motion was originally filed on July 5, 2005, but was vacated without prejudice for
     defendants' failure to comply with E.D. Local Rule 56-260(a).

25
          [2]  Defendants King and Rogers, however, were shortly thereafter dismissed from the case
26   by Order, filed on March 22, 2006.

                                                  1

Plaintiff's Allegations

        The court will set forth the allegations of plaintiff's first amended complaint, as previously detailed by the court in its <u>Order</u> filed on March 1, 2005, and its <u>Order</u> and <u>Findings and Recommendations</u>, filed on February 3, 2006, adopted by <u>Order</u>, filed on March 22, 2006. Plaintiff is proceeding on a first amended complaint filed on October 6, 2003, as subsequently modified. The allegations herein are further modified to reflect that defendants King and Rogers have since been dismissed from this action, and that this action now proceeds only as to plaintiff's claims for money damages.

        On the morning of September 29, 2001, while playing basketball in the New Folsom State Prison gym, plaintiff ruptured his left Achilles tendon. First Amended Complaint (FAC), p. 5. Plaintiff informed Correctional Officer (C/O) Mendoza, not a defendant, that his "foot was numb" and that he "couldn't feel the floor." <u>Id.</u> Plaintiff could not feel his Achilles tendon, and C/O Mendoza told plaintiff that he appeared to have an injury to his Achilles tendon; Mendoza called for an escort for plaintiff to the clinic. <u>Id.</u>

        Plaintiff was transported first via gurney by non-defendants Sergeants Simms and Gold, then by wheelchair by non-defendant C/O Quinn to the medical clinic. FAC, pp. 5-6. C/O Quinn stated that plaintiff had picked the wrong day to injure himself "because everyone complained about this medical trained assistant (M.T.A.)," whose name he did not know. <u>Id.</u>, p. 6.

        When plaintiff explained to M.T.A. C. Chisum that his injury had occurred when plaintiff went up for a rebound while another inmate was coming down and struck the back of plaintiff's left ankle with his forearm, defendant Chisum told plaintiff that his injury "couldn't have happened that way." <u>Id.</u> Plaintiff told defendant Chisum he was in too much pain to argue, that his "foot was numb" and his "Achilles was gone." Defendant Chisum ordered plaintiff to stand up so she could make an assessment, but plaintiff told her it was too painful for him to stand and that his equilibrium was off. <u>Id.</u> Plaintiff attempted to stand, almost fell and was assisted back to his wheelchair by C/O Quinn. <u>Id.</u>, p. 7. Plaintiff told defendant Chisum that he had had a sprained ankle before and that the pain he was now suffering was different and "more excruciating." Defendant Chisum nevertheless told plaintiff that he had only a sprained ankle, had good range of motion and proceeded to wrap an Ace bandage around plaintiff's foot and ankle, gave him two days' worth of Tylenol and ice, a two-day "lay-in," and a cane. <u>Id.</u> When plaintiff asked to see a physician, defendant Chisum told him that, although there was an on-duty or

2

on call doctor, plaintiff had only suffered a non-emergency sprained ankle and would have to return to his cell.  <u>Id</u>.

When on October 2, 2001, plaintiff received a medical ducat for x-rays at the main infirmary on A-yard, defendant C/O Bledsoe, who was responsible for transporting B-yard inmates to A-yard for medical procedures that day, told plaintiff after he was paged and had hobbled to the administration office, that he would either walk or his appointment would be cancelled as "refused."  FAC, p. 8.  Plaintiff had shown defendant Bledsoe that his foot had fluid visibly on or in it and had told her that he had suffered a separated Achilles and could not walk all the way.  <u>Id</u>.  Nonetheless, defendant Bledsoe refused to allow him transport via van or wheelchair and plaintiff was forced to limp and drag one foot while handcuffed and with a cane for approximately half of mile for his x-rays.  <u>Id</u>.

On October 3, 2001, plaintiff was assisted by another inmate to the B-yard medical clinic, where he asked defendant Pugh to summon medical personnel to tell them that he had a medical emergency, an injured Achilles, that had been untreated for four (4) days.  FAC, p. 9 & Exhibit A-1.  Defendant Pugh refused, saying "No ducat, no doctor.  I don't care what you're excuse is."  <u>Id</u>.  Defendant Pugh ordered plaintiff away from the gate.  <u>Id</u>.

On October 4, 2001, plaintiff returned to B-yard medical clinic for medical treatment.  FAC, p. 10.  Defendant MTA Johnson was taking a cigarette break and, when told by plaintiff that he needed to see a doctor for his Achilles tendon injury and that he was in "a lot of pain," continued to smoke, whereupon plaintiff told her that he had not seen a doctor for five days and showed her his foot, saying that he had a fluid build-up and a medical emergency.  <u>Id</u>.

Defendant Johnson responded: "It can't be much of an emergency because you walked down here."  <u>Id</u>.  Defendant Johnson told plaintiff to fill out a sick call form 7362, but when plaintiff asked that she put him on the doctor's "line add-on list," she refused.  <u>Id</u>., & Exhibit A-2.

On afternoon yard release on October 4, 2001, plaintiff left his cell and refused to lock up when C/O Orr (not a defendant) told him to.  FAC, p. 11.  Plaintiff told C/O Orr that he had been in intense pain for five days and had not gotten a full night's rest since his injury and that he had been denied medical treatment several times.  <u>Id</u>. & Exhibit A-3.  C/O Orr told plaintiff to stand by and thereafter informed MTA Howell [or Howe] (not a defendant) that plaintiff had what appeared to be a serious injury.  FAC, p. 11.  Howell placed plaintiff on the doctor's add-on list, plaintiff was seen by Dr. Burvant (not a defendant) that day at around 2:00 p.m. and was diagnosed with a ruptured or severed Achilles tendon.  <u>Id</u>

On October 5, 2001, plaintiff's lower leg was immobilized in a splint at CSP-Sac IV. Id. On October 22, 2001, plaintiff's lower left calf, from knee to toes, was placed in a cast by non-defendant Dr. Kofoed, an orthopedic specialist, at CSP-Vacaville. Id. On January 14, 2002, Dr. Kofoed removed plaintiff's cast with specific instructions that plaintiff's rehabilitation start immediately, explaining that therapy and walking exercises were crucial to his recovery. FAC, pp. 11-12.[3]

........................................................................................

Plaintiff alleges that defendants violated his Eighth and Fourteenth Amendment rights, as well as prison regulations, by their deliberate indifference to his serious medical needs and their conduct resulted in his having a deformed left calf, excessive scar tissue and continuing severe muscle cramping, as well as mental and emotional injury. FAC, pp. 16-19. Plaintiff seeks [] money damages.

See Order, filed on March 1, 2005, pp. 5-9; see also, Order and Findings and Recommendations, filed on February 3, 2006, pp. 2-4, adopted by Order filed on March 22, 2006.

Motion for Summary Judgment

### *Legal Standard for Summary Judgment*

Summary judgment is appropriate when it is demonstrated that the standard set forth in Fed. R. Civ. P. 56(c) is met. "The judgment sought shall be rendered forthwith if . . . there is no genuine issue as to any material fact, and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

---

[3] Because the remaining allegations, relating to plaintiff's allegedly not having been permitted the therapeutic half-hour daily walking exercise from January 14, 2002, until May 28, 2002, implicate two defendants, King and Rogers, who have since been dismissed from this action, the court no longer includes plaintiff's claims involving that period.

1   Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct., 2548, 2553 (1986).  "[W]here the
2   nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary
3   judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers
4   to interrogatories, and admissions on file.'"  Id.  Indeed, summary judgment should be entered,
5   after adequate time for discovery and upon motion, against a party who fails to make a showing
6   sufficient to establish the existence of an element essential to that party's case, and on which that
7   party will bear the burden of proof at trial.  See id. at 322, 106 S. Ct. at 2552.  "[A] complete
8   failure of proof concerning an essential element of the nonmoving party's case necessarily
9   renders all other facts immaterial."  Id.  In such a circumstance, summary judgment should be
10  granted, "so long as whatever is before the district court demonstrates that the standard for entry
11  of summary judgment, as set forth in Rule 56(c), is satisfied."  Id. at 323, 106 S. Ct. at 2553.

12          If the moving party meets its initial responsibility, the burden then shifts to the
13  opposing party to establish that a genuine issue as to any material fact actually does exist.  See
14  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356
15  (1986).  In attempting to establish the existence of this factual dispute, the opposing party may
16  not rely upon the allegations or denials of its pleadings but is required to tender evidence of
17  specific facts in the form of affidavits, and/or admissible discovery material, in support of its
18  contention that the dispute exists.  See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11,
19  106 S. Ct. at 1356 n. 11.  The opposing party must demonstrate that the fact in contention is
20  material, i.e., a fact that might affect the outcome of the suit under the governing law, see
21  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986); T.W. Elec.
22  Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the
23  dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the
24  nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

25          In the endeavor to establish the existence of a factual dispute, the opposing party
26  need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the

1   claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

2   versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary

3   judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a

4   genuine need for trial.'"  Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356 (quoting Fed. R. Civ. P.

5   56(e) advisory committee's note on 1963 amendments).

6           In resolving the summary judgment motion, the court examines the pleadings,

7   depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

8   any.  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson,

9   477 U.S. at 255, 106 S. Ct. at 2513.  All reasonable inferences that may be drawn from the facts

10  placed before the court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S.

11  at 587, 106 S. Ct. at 1356.  Nevertheless, inferences are not drawn out of the air, and it is the

12  opposing party's obligation to produce a factual predicate from which the inference may be

13  drawn.  See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985),

14  aff'd, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing

15  party "must do more than simply show that there is some metaphysical doubt as to the material

16  facts . . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the

17  nonmoving party, there is no 'genuine issue for trial.'"  Matsushita, 475 U.S. at 587, 106 S. Ct.

18  1356 (citation omitted).

19          On March 11, 2004, the court advised plaintiff of the requirements for opposing a

20  motion pursuant to Rule 56 of the Federal Rules of Civil Procedure.  See Rand v. Rowland, 154

21  F.3d 952, 957 (9th Cir. 1998) (en banc), cert. denied, 527 U.S. 1035 (1999), and Klingele v.

22  Eikenberry, 849 F.2d 409, 411-12 (9th Cir. 1988).

23          *Defendants' Motion*

24          Defendants move for summary judgment on the grounds that 1) defendant Chisum

25  provided plaintiff reasonable and acceptable medical care and the other defendants did not deny,

26  delay or interfere with plaintiff's medical care; and 2) defendants are entitled to qualified

6

1   immunity because plaintiff's constitutional rights were not violated.  Motion for Summary

2   Judgment, pp. 1-11.

3                    *Plaintiff's Opposition/Supplemental Opposition*

4           Plaintiff has averred that the deliberate indifference of the defendants to his

5   serious medical injury caused him unnecessary pain and suffering; in his opposition, the focus of

6   his argument is that the actions or inactions of these defendants, particularly defendant Chisum,

7   caused him further injury and the denial and delay of medical care also deprived him of the most

8   efficacious treatment for his Achilles' tendon injury, which he contends would have been

9   surgery; he believes his left calf cramps and "deformed" left calf are a result of the treatment he

10  received from defendants.[4]  Opposition (Opp., pp. 1-2); plaintiff's declaration (Dec.), ¶ 17;

11  Supplemental (Supp.) Opp., pp. 3-7.

12               *Reply*

13          Defendants contend that plaintiff has failed to oppose their motion with any expert

14  testimony which signifies that his dispute constitutes nothing more than a difference of opinion

15  as to the "course and scope of his medical care, which is not cognizable under § 1983.  Reply, p.

16  2.

17               *Legal Standard for Eighth Amendment Claim*

18          In order to state a § 1983 claim for violation of the Eighth Amendment based on

19  inadequate medical care, plaintiff must allege "acts or omissions sufficiently harmful to evidence

20  deliberate indifference to serious medical needs."  Estelle v. Gamble, 429 U.S. 97, 106, 97 S. Ct.

21  285, 292 (1976).  To prevail, plaintiff must show both that his medical needs were objectively

22  serious, and that defendants possessed a sufficiently culpable state of mind.  Wilson v. Seiter,

23  501 U.S. 294, 299, 111 S. Ct. 2321, 2324 (1991); McKinney v. Anderson, 959 F.2d 853 (9th Cir.

24

25          [4] Plaintiff does not specify whether he attributes further injury he may have suffered
    primarily to the conduct of these defendants as opposed to his not being permitted his daily
26  walking therapy for a period of time by defendants who have since been dismissed.

                                              7

1  1992) (on remand).  The requisite state of mind for a medical claim is "deliberate indifference."

2  Hudson v. McMillian, 503 U.S. 1, 4, 112 S. Ct. 995, 998 (1992).

3       A serious medical need exists if the failure to treat a prisoner's condition could

4  result in further significant injury or the unnecessary and wanton infliction of pain.  Indications

5  that a prisoner has a serious need for medical treatment are the following:  the existence of an

6  injury that a reasonable doctor or patient would find important and worthy of comment or

7  treatment; the presence of a medical condition that significantly affects an individual's daily

8  activities; or the existence of chronic and substantial pain.  See, e.g., Wood v. Housewright, 900

9  F. 2d 1332, 1337-41 (9th Cir. 1990) (citing cases); Hunt v. Dental Dept., 865 F.2d 198, 200-01

10  (9th Cir. 1989).  McGuckin v. Smith, 974 F.2d 1050, 1059-60 (9th Cir. 1992), overruled on other

11  grounds, WMX Technologies v. Miller, 104 F.3d 1133 (9th Cir. 1997) (en banc).

12       In Farmer v. Brennan, 511 U.S. 825, 114 S. Ct. 1970 (1994) the Supreme Court

13  defined a very strict standard which a plaintiff must meet in order to establish "deliberate

14  indifference."  Of course, negligence is insufficient.  Farmer, 511 U.S. at 835, 114 S. Ct. at 1978.

15  However, even civil recklessness (failure to act in the face of an unjustifiably high risk of harm

16  which is so obvious that it should be known) is insufficient.  Id. at 836-37, 114 S. Ct. at 1979.

17  Neither is it sufficient that a reasonable person would have known of the risk or that a defendant

18  should have known of the risk.  Id. at 842, 114 S. Ct. at 1981.

19       It is nothing less than recklessness in the criminal sense—a subjective standard—

20  disregard of a risk of harm of which the actor is actually aware.  Id. at 838-842, 114 S. Ct. at

21  1979-1981.  "[T]he official must both be aware of facts from which the inference could be drawn

22  that a substantial risk of serious harm exists, and he must also draw the inference."  Id. at 837,

23  114 S. Ct. at 1979.  Thus, a defendant is liable if he knows that plaintiff faces "a substantial risk

24  of serious harm and disregards that risk by failing to take reasonable measures to abate it."  Id. at

25  847, 114 S. Ct. at 1984.  "[I]t is enough that the official acted or failed to act despite his

26  knowledge of a substantial risk of serious harm."  Id. at 842, 114 S. Ct. at 1981.  If the risk was

1   obvious, the trier of fact may infer that a defendant knew of the risk.  Id. at 840-42, 114 S. Ct. at

2   1981.  However, obviousness per se will not impart knowledge as a matter of law.

3           Also significant to the analysis is the well established principle that mere

4   differences of opinion concerning the appropriate treatment cannot be the basis of an Eighth

5   Amendment violation.  Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996); Franklin v.

6   Oregon, 662 F.2d 1337, 1344 (9th Cir. 1981).

7           Moreover, a physician need not fail to treat an inmate altogether in order to violate

8   that inmate's Eighth Amendment rights.  Ortiz v. City of Imperial, 884 F.2d 1312, 1314 (9th Cir.

9   1989).  A failure to competently treat a serious medical condition, even if some treatment is

10  prescribed, may constitute deliberate indifference in a particular case.  Id.

11          Additionally, mere delay in medical treatment without more is insufficient to state

12  a claim of deliberate medical indifference.  Shapley v. Nevada Bd. of State Prison Com'rs, 766

13  F.2d 404, 408 (9th Cir. 1985).  Although the delay in medical treatment must be harmful, there is

14  no requirement that the delay cause "substantial" harm.  McGuckin, 974 F.2d at 1060, citing

15  Wood v. Housewright, 900 F.2d 1332, 1339-1340 (9th Cir. 1990) and Hudson, 112 S. Ct. at 998-

16  1000.  A finding that an inmate was seriously harmed by the defendant's action or inaction tends

17  to provide additional support for a claim of deliberate indifference; however, it does not end the

18  inquiry.  McGuckin, 974 F.2d 1050, 1060 (9th Cir. 1992).  In summary, "the more serious the

19  medical needs of the prisoner, and the more unwarranted the defendant's actions in light of those

20  needs, the more likely it is that a plaintiff has established deliberate indifference on the part of

21  the defendant."  McGuckin, 974 F.2d at 1061.

22          Superimposed on these Eighth Amendment standards is the fact that in cases

23  involving complex medical issues where plaintiff contests the type of treatment he received,

24  expert opinion will almost always be necessary to establish the necessary level of deliberate

25  indifference.  Hutchinson v. United States, 838 F.2d 390 (9th Cir. 1988).  Thus, although there

26  may be subsidiary issues of fact in dispute, unless plaintiff can provide expert evidence that the

1  treatment he received equated with deliberate indifference thereby creating a material issue of

2  fact, summary judgment should be entered for defendants.  The dispositive question on this

3  summary judgment motion is ultimately <u>not</u> what was the most appropriate course of treatment

4  for plaintiff, but whether the failure to timely give a certain type of treatment was, in essence,

5  criminally reckless.

6  <i>Discussion</i>

7          Preliminarily, the court notes that plaintiff complains of medical care that was

8  allegedly denied, delayed or intentionally interfered with by defendants for his serious Achilles'

9  tendon injury during two periods: from September 29, 2001, until October 4, 2001, and from

10  January 14, 2002, until May 28, 2002.  <u>See</u> Opp., p. 2.  Because defendants King and Rogers

11  have been dismissed from this action since the motion for summary judgment was re-noticed (<u>see</u>

12  <u>Order</u>, filed on 3/22/06), and these are the only defendants implicated by the period of time from

13  January 14, 2002, until May 28, 2002, only the period of time from September 29, 2001, until

14  October 4, 2001, is still at issue for the remaining defendants.  In addition, in his supplemental

15  opposition, plaintiff restricts his argument to the conduct of defendants from September 29,

16  2001, through October 4, 2001; later on October 4, 2001, he was seen by a physician, after

17  receiving assistance from a non-defendant, and on October 5, 2001, plaintiff's lower extremity

18  below the knee was immobilized.  Supplemental Opposition (Supp. Opp.), pp. 5-6.

19  <i>Undisputed Facts</i>

20          The facts as set forth by defendants are either expressly undisputed or are not

21  materially disputed.  Defendants' undisputed fact **(DUF) No. 1**: plaintiff was seen in the B-

22  Facility Clinic on September 29, 2001, and a CDC 7219, Medical Report of Injury or Unusual

23  Occurrence, was completed.  Def.'s Exh. B, Declaration of Dr. Douglas Peterson, ¶ 6; Def.'s

24  Exh. C, Avitia, Custodian of Records, Dec. at 0002; Opp., p. 10.  **DUF No. 2**: plaintiff stated

25  that he was playing basketball when someone came down on the back of his left ankle.  <u>Id</u>.  As to

26  **DUF No. 3**: defendants aver that plaintiff was provided with Motrin, x-rays, and a cane, def.'s

10

Exh. B, Peterson Dec., ¶ 6; def's. Exh. C., Avitia Dec. at 0003, plaintiff concedes that x-rays were taken and he was provided with a cane for a three-day period, but asserts that he received six Tylenol, not Motrin.  Opp., p. 10.  As to **DUF No. 4**, defendants state that x-ray s of plaintiff's left ankle were taken on October 2, 2001, and that Radiologist Dr. Goller reported: "There is not soft tissue swelling seen laterally.  Underlying osseous structures are intact.  No fracture or dislocation is seen.  Note is made of calcaneal spurring.  CONCLUSION: Soft tissue swelling without acute underlying osseous injury identified."  Def.'s Exh. B, Peterson Dec., ¶ 7; Def.'s Exh. C, Avitia Decl. at 0004.  Plaintiff concedes that x-rays were taken that day.  Opp., p. 11.

> **DUF No. 5**: The facility physician ordered an orthopedic consultation on October 5, 2001, and an immobilization of the left lower extremity which was applied.  Def.'s Exh. B, Peterson Dec., ¶ 8; Def.'s Exh. C, Avitia Dec. at 0005; Opp., p. 11.  **DUF No. 6**:  On October 15, 2001, the referral for the orthopedic consultation was authorized by the Medical Authorization Review (MAR) Committee.  Def.'s Exh. B, Peterson Dec., ¶ 9; Def.'s Exh. C, Avitia Decl. at 0006; Opp., p. 11.

> **DUF No. 7:** Dr. Kofoed saw plaintiff on December 3, 2001, and he applied a cast for immobilization of the left lower extremity.  Def.'s Exh. B, Peterson Dec., ¶ 10; Def.'s Exh. C, Avitia Decl. at 0007; Opp., p. 11.  **DUF No. 8**: Dr. Kofoed also saw plaintiff, on January 14, 2002, and he recommended stretching and walking exercises in addition to the crutches.  Def.'s Exh. B, Peterson Dec., ¶ 11; def.'s Exh. C, Avitia Dec. at 0008; Opp., p. 11.

> **DUF No. 9**: On January 22, 2002, plaintiff was seen by Dr. Penner who authorized a cane, at plaintiff's request, instead of the crutches recommended by Dr. Kofoed.  Plaintiff's housing unit officer confirmed that plaintiff was then in possession of a cane.  Def.'s Exh. B, Peterson Dec., ¶ 12; Def.'s Exh. C, Avitia Decl. at 0009; Opp., p. 11.

> In **DUF 10,** defendants state that Dr. Mitchell wrote an order on February 26, 2002, for x-rays, and orthopedic follow up, and a CDC128-C, Medical Chrono, for the use of a

1    cane for a six-week period.  Def.'s Exh. B, Peterson Dec., ¶ 13; Def.'s Exh. C, Avitia Decl. at

2    0010-11.  In his opposition (p. 12), plaintiff asserts that he does not recall this set of x-rays being

3    taken or receiving the orthopedic follow-up, but he does not flatly deny that it occurred;

4    defendants show the record of the physician's orders but no record of the consultation itself is

5    shown; however, the fact is essentially undisputed because defendants do not state that it

6    occurred, only that it was ordered.  In **DUF No. 11**, defendants set forth that plaintiff was seen by

7    Dr. Penner in the B-Facility Clinic on February 27, 2002, and plaintiff complained of mild pain

8    in the area of his Achilles; Dr. Penner informed plaintiff that an orthopedic consultation had been

9    ordered on February 26, 2002.  Def.'s Exh. B, Peterson Dec., ¶ 14; Def.'s Exh. C, Avitia Decl. at

10   0012.  Plaintiff concedes that all occurred as set forth in DUF No. 11, but, once again asserts that

11   he does not recall (subsequently) receiving the consultation referenced therein.  Opp., p. 5.

12   Therefore, although portions of DUF Nos. 10 and 11 are undisputed, the court finds that the

13   follow-up orthopedic consultation ordered on February 26, 2002, has not been definitively

14   established to have occurred; on the other hand, the events occurring on this date are within the

15   time frame no longer at issue in this action, as noted previously.

16          *Defendant Chisum*

17          Defendants correctly contend that the only defendant that plaintiff sued who was

18   directly involved in his medical care at CSP-SAC after he had his ankle achilles tendon injury on

19   September 29, 2001, is defendant Chisum.  MSJ, p. 5.  In the professional opinion of Dr.

20   Peterson, CSP-SAC's Chief, Clinical Services Health Care Manager, defendant Chisum took

21   steps in treating plaintiff's injury that were "reasonable and medically acceptable," by assessing

22   the injury, filling out the CDC-7219, and calling the medical officer of the day to obtain orders as

23   to plaintiff's treatment.  Def.'s Exh. B, Peterson Dec., ¶ 20.  Dr. Le, not a defendant, prescribed

24   800 mg. Motrin tid, a cane for three days, an x-ray as soon as possible, and a return to the

25   medical line the following Monday.  Id., & def.'s Exh. C, Avitia Dec. at 0003.

26   \\\\\

1    Plaintiff does not dispute the steps taken by defendant Chisum for which

2    defendants produce evidence; his allegations center on her having shown some insensitivity as to

3    his level of pain, and on her assessment having apparently included a mis-diagnosis of his injury,

4    assuming that she did tell him, which the court must do, defendants having failed to counter the

5    point, that he had a sprained ankle, rejecting plaintiff's own evaluation that this injury was

6    something else.  FAC, p. 7; Opp., p. 16.  She also rejected his request for a doctor, when he told

7    her his "Achilles was gone," telling him he had suffered a non-emergency injury.  Id., p. 6 &

8    Opp., plaintiff's dec., p. 16.  Plaintiff also contends that she did not provide him with a ducat for

9    the doctor's line[5] and that it may be inferred from the record that defendant Chisum did not

10   inform Dr. Le that plaintiff had told her his "Achilles was gone," which, of course, would lead to

11   the inference that Dr. Le might have either seen him that day or perhaps would have prescribed

12   different treatment.  Supp. Opp., p. 5.  He contends that her actions caused him to be returned to

13   his cell and to not be seen by a doctor for five days.  Opp., p. 16.  Defendants do not state what

14   actions defendant Chisum took to assure that any follow-up x-ray was scheduled, even though

15   the notes cited by defendants includes the notation that plaintiff was to receive an x-ray of his left

16   ankle "ASAP."  Def.'s Exh, C., at 0003.  It may be that it was not her job to make such an

17   arrangement but that is not clarified.  Plaintiff does include a copy of an inmate priority pass,

18   dated 10-2-01 for "x-ray," and one dated 10-5-01 for the "Dr. Line," but does not clarify the

19   source of the first ducat.  Opp., Exh. 1, p. 19.

20   Notwithstanding what may have been an outright mis-diagnosis by this defendant

21   and a failure to provide plaintiff a ducat on that day for the doctor's line or for an x-ray (which

22   later turned out to be inconclusive in any event), defendants' expert, as noted, maintains that it is

23   his professional opinion that this defendant acted in a medically reasonable fashion by the steps

24   that she did take and that assessment.

25

26   [5] Had she done so, plaintiff avers, he would not have brought this lawsuit.  Supp. Opp., p. 5.

The court is not bound to accept an expert's opinion when it conflicts with common sense notions of reasonable medical care, and drawing inferences in plaintiff's favor, as must be done on summary judgment, the actions of Chisum were not reasonable. Reasonable medical personnel listen to patients, and at least rule out what the patient believes is the nature of the injury. There was no listening here.

Nevertheless, this is an Eighth Amendment case, not a negligence case. The "what-we-know-now" cannot be superimposed on the "what-was-known-then." Surely, if Chisum drew the conclusion that the Achilles heel was ruptured, or was reckless in diagnosis and nevertheless "blew it off" as a ankle sprain, the Eighth Amendment would be implicated. But there was no clear *objective evidence* of an Achilles rupture, and the quick, callous treatment (again drawing inferences in plaintiff's favor) was not some purposeful ignoring of a serious medical condition for which enhanced pain was a near certainty.

Plaintiff also maintains that surgery is the most common treatment for a ruptured Achilles' tendon, that he was compelled to receive less efficacious treatment, casting and splinting, due to the "negligence and refusal to inform a doctor of his Achilles injury" by Chisum as well as the other defendants. Opp., p. 13. Plaintiff includes an unauthenticated document from what appears to be a website called "my.webmd.com," which discusses the possible treatments for Achilles' tendinopathy or Achilles' tendon rupture, including, for example, the following statement: "[the results of surgery for an Achilles' tendon rupture are best when the surgery is done soon after the injury." Opp., p. 23. However, plaintiff provides no medical expert witness who states that surgery would have been appropriate for his own injury at any time, whether he had been treated by a doctor immediately or not.

Although neither plaintiff nor defendants reference it, there is a notation in the medical records produced by defendants that Dr. Kofoed evidently wrote on January 14, 2002, that after plaintiff's Achilles' rupture had been "casted" for twelve weeks and the cast removed that a "slight defect was noted." Plaintiff does not provide any expert evidence that demonstrates

14

1    that the source of the defect, if this is what plaintiff meant when he asserts that his left calf is

2    now deformed, had anything to do with either a delay in or the form of treatment that was

3    provided.  Def.'s Exh. C at 0008.  Moreover, plaintiff has not sued any treating physician, so that

4    cannot be the basis for his claim.  Defendants' motion for summary judgment as to this defendant

5    should be granted because plaintiff's belief that he might and should have received surgery for

6    his injury had he been treated as having had an Achilles' tendon injury from the outset by this

7    defendant amounts, ultimately, as defendants note (reply, pp. 3-4), to a layperson's difference of

8    opinion concerning the appropriate treatment, which cannot be the basis of an Eighth

9    Amendment violation.  Jackson v. McIntosh, supra, 90 F.3d at 332; Sanchez v. Vild, 891 F.2d,

10   240, 242 (9th Cir. 1989); Franklin v. Oregon, supra, 662 F.2d at 1344.

11             *Defendant Bledsoe*

12             As to defendant Bledsoe, defendants argue she did not deny, delay or interfere

13   with plaintiff's medical care on October 2, 2001, when plaintiff, ducated to obtain an x-ray, was

14   not assisted with a van ride or wheelchair to obtain his x-rays because plaintiff was ambulatory

15   and received adequate walking assistance with his cane, in defendant's medical expert's opinion.

16   Def.'s Exh. C, Peterson Dec., ¶ 24.  Plaintiff counters that defendant Bledsoe herself, in an

17   interrogatory response, indicated that the appropriate method of transport would have been by

18   wheelchair or gurney.  Opp., Exh. 1, p. 20:

19             Plaintiff's Interrogatory No. 7:
              Describe in as much detail as possible the normal procedure of
20            transporting a [sic] inmate with a broken foot, leg, ankle, or
              Achilles injury to main infirmary.
21
              Defendant Bledsoe's Response:
22            Transport of an inmate who was not mobile would be by
              wheelchair or gurney.
23

24             Of course, although defendants do not directly address this point, it may be

25   inferred that defendant Bledsoe concluded that plaintiff was not suffering from an injury that

26   rendered him immobile, as he arrived walking and with a cane.  Indeed, in response to the

immediately preceding interrogatory, defendant Bledsoe maintains that she "did not refuse to provide adequate transportation for plaintiff." Id. Defendants, however, do not deny that plaintiff had shown defendant Bledsoe that his foot had fluid visibly on or in it, i.e., apparent swelling, and that he had said that he had suffered a separated Achilles and could not walk all the way, nor do they deny that he was forced to hobble handcuffed, dragging his foot with his "non-mobilized" injured left ankle painfully for almost half a mile to get his ankle x-rayed. FAC, p. 8, Opp., pp. 14, 16. Plaintiff argues defendant Bledsoe's failure to provide him with transportation may have caused further medical injury. However, defendants' expert medical testimony is that plaintiff was ambulatory and had a cane to assist his walking such that defendant Bledsoe's failure to provide transportation did not deny, delay or interfere with plaintiff's treatment. Def.'s Exh. B, Peterson Dec. ¶ 24. Although plaintiff was most probably subjected temporarily to unnecessary discomfort by having to make his way in handcuffs and without assistance beyond the use of a cane for some distance to receive his x-ray, without medical evidence demonstrating that this caused his ankle further injury, defendant Bledsoe's inaction does not rise to the level of deliberate indifference but amounts, at most, to negligence which does not constitute an Eighth Amendment violation. Farmer, supra, 511 U.S. at 835, 114 S. Ct. at 1978. Defendants' motion for summary judgment as to defendant Bledsoe should be granted.

### Defendant Pugh

Plaintiff contends that defendant Correctional Officer Pugh, on October 3, 2001, upon plaintiff's request for medical care for his Achilles' tendon injury, untreated, he asserts, at that point for four days, warned him away, rather than getting him assistance (FAC, p. 9; Opp., p. 16); defendant's expert states that Pugh did not deny, delay or interfere with plaintiff's medical care or treatment because he was "already receiving reasonable and medically acceptable care." Def.'s Exh. B, Peterson Dec., ¶ 25. Plaintiff has not disputed that defendants took x-rays of plaintiff's left ankle, the day before, on October 2, 2001, and that a radiologist found, inter alia, soft tissue swelling but no fracture or dislocation. See DUF No. 4, above. Nor has plaintiff

1   presented expert medical testimony that defendant Pugh's failure to allow him to see a doctor

2   caused a significant delay in the treatment of his Achilles' tendon injury, since the injury had

3   been x-rayed the day before and was, ultimately, placed in a cast by October 5, 2001.  Again,

4   there is little doubt that plaintiff suffered pain during this period but defendant Pugh's failure to

5   act has not been shown to reach the requisite level of recklessness in the criminal sense to

6   demonstrate an Eighth Amendment violation.  <u>Farmer</u>, <u>supra</u>, at 838-842, 114 S. Ct. at 1979-

7   1981.  Defendants' motion for summary judgment should be granted as to defendant Pugh.

8                    *Defendant Johnson*

9                    As to defendant MTA Johnson, plaintiff contends that this individual

10  on October 4, 2001, after plaintiff told her he was in pain and had not seen a doctor for five days,

11  claimed a medical emergency, showed her his foot with fluid build-up, asked her to examine it,

12  and to place him on the doctor's line, which she refused to do.  FAC, p. 10; Opp., p. 16.  This

13  inaction by this defendant may be contrasted with that of non-defendant Correctional Officer Orr,

14  who, when plaintiff told him he had been in intense pain for five days, took action which resulted

15  in plaintiff's being seen that afternoon by a physician, after which plaintiff was diagnosed with a

16  ruptured or severed Achilles' tendon.  FAC, p. 11; Opp., pp. 16-17.  Defendants' expert states,

17  apparently with no irony, as to defendant Johnson's omissions that defendant Johnson did not

18  deny, delay or interfere with plaintiff's medical care "because the medical records reflect that

19  [plaintiff] was seen that day by both MTA Howe and Dr. Burvant."  Def's. Exh. B, Peterson

20  Dec., ¶ 21.  Plaintiff argues in his opposition that the actions, or inactions, of defendant Johnson,

21  in essence, did, indeed, delay the medical treatment he needed.  Opp., p. 16-17.

22                   In this instance, it would appear that defendant MTA Johnson, unlike defendants

23  Bledsoe and Pugh, might be better expected to recognize a serious medical condition and that her

24  failure to obtain medical assistance more immediately for plaintiff was conduct more egregious

25  on the face of it than that displayed by Bledsoe and Pugh.  In that sense, this defendant is saved

26  from having to defend her inactions as giving rise to a violation of plaintiff's Eighth Amendment

                                                17

1   rights primarily by the more appropriate conduct of another, whose actions kept those of

2   Johnson's from amounting to a delay significant enough to rise to a deprivation of plaintiff's

3   constitutional rights.  Because plaintiff was afforded medical care later that very day, and

4   plaintiff does not provide expert medical testimony to the contrary, defendant Johnson's

5   omission cannot be said to have deprived plaintiff of adequate medical care.  <u>Shapley v. Nevada</u>

6   <u>Bd. of State Prison Com'rs</u>, <u>supra</u>, 766 F.2d at 408.  Defendants' motion for summary judgment

7   as to defendant Johnson should be granted.

8           Defendants' alternative argument that they are entitled to qualified immunity need

9   not be reached as the court has not found any genuine issue of material fact that remains which

10   implicates plaintiff's constitutional rights.

11   <u>Conclusion</u>

12           In the scheme of things, obtaining treatment and a correct diagnosis in

13   approximately five days in the prison context is not indicative of an Eighth Amendment case.

14   Nevertheless, the matter on summary judgment is close because of callousness by some, or

15   assumption by some, that all prisoners are malingerers.  Although the facts demonstrate

16   inappropriate responses by some prison personnel, these inappropriate responses did not

17   demonstrably lead to further injury, or any enhancement of pain, which would have been present

18   in any event, that would satisfy an Eighth Amendment threshold.

19           Accordingly, IT IS HEREBY RECOMMENDED that defendants' motion for

20   summary judgment, filed on March 7, 2006, be granted, and judgment be entered for defendants.

21           These findings and recommendations are submitted to the United States District

22   Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

23   days after being served with these findings and recommendations, any party may file written

24   objections with the court and serve a copy on all parties.  Such a document should be captioned

25   "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

26   shall be served and filed within ten days after service of the objections.  The parties are advised

that failure to file objections within the specified time may waive the right to appeal the District

Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

DATED: 2/5/07

/s/ Gregory G. Hollows

GREGORY G. HOLLOWS
UNITED STATES MAGISTRATE JUDGE

GGH:009
burg0643.msj

19